UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ALAN MIRACLE,

                    Plaintiff,              06-CV-6049T

v.                                          DECISION
                                            and ORDER
JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____


## INTRODUCTION

        Plaintiff, Alan Miracle ("Miracle") filed this action pursuant
to the Social Security Act, codified at 42 U.S.C. §§ 405(g) and
1383(c)(3), seeking review of a final decision of the Commissioner
of Social Security ("Commissioner"), denying his application for
Disability Insurance Benefits ("DIB").  On July 24, 2006, the
Commissioner moved for summary judgment.  On August 8, 2006,
plaintiff cross-moved for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure.

        For the reasons that follow, this Court finds that the
Commissioner's decision is supported by substantial evidence.
Accordingly, plaintiff's motion for judgment on the pleadings is
denied and defendant's motion for summary judgment is granted.

## BACKGROUND

        Plaintiff is a 41 year old man with a high school education.
(Tr. 55).  He alleges that he has been disabled since June 9, 2000

because of low back pain. (Tr. 56).  On July 16, 2003, plaintiff filed an application for Social Security Insurance ("SSI") benefits. (Tr. 38-40).  The application was denied by Notice dated August 27, 2003. (Tr. 27-29).  Plaintiff requested a hearing which was held on July 20, 2005 at which plaintiff appeared represented by an attorney and testified.  By decision dated September 8, 2005, the Administrative Law Judge ("ALJ") found Miracle was not disabled because he had the residual functional capacity to perform sedentary work. (Tr. 12-24).  Plaintiff requested review by the Appeals Council and the decision of the ALJ became final when the Appeals Council denied review on December 23, 2005. (Tr. 5-7). Thereafter, plaintiff commenced this action.

A.   Medical Background

Plaintiff claims that he began experiencing back pain on July 15, 1998 and that he became unable to work because of the pain on June 6, 2000. (Tr. 66). He sought treatment for lower back pain with Dr. Thomas Masten, an orthopedic doctor, beginning April 15, 1999. (Tr. 68).

An MRI scan performed on October 13, 1998 found multilevel degenerative disc disease, moderately severe foraminal stenosis at the left L5-S1, and annular tear involving the L4-L5 and L5-S1 discs.  Broad based protrusion at L4-L5 was causing compression of nerve roots and thecal sac. (Tr. 179, 203).

2

Dr. Olaf Lieberg, a chiropractor, examined plaintiff on December 29, 1998 for back pain and sciatica. (Tr. 314). Plaintiff had tenderness to palpation of the dorsal and lower lumbosacral spine, limited motion of his back with forward flexion of 40 degrees, extension of five degrees and lateral bending of ten degrees. (Tr. 315). X-rays of the dorsal spine showed "minimal degenerative changes." (Tr. 315). Dr. Lieberg opined that plaintiff could continue doing light duty work with restrictions of lifting less than 25 pounds. (Tr. 315).

Dr. Masten examined plaintiff on April 15, 1999 at which time Miracle complained of "popping" at his thoracic and low back since July, 1998. (Tr. 191). He had a workman's compensation injury in 1993 but it had lessened to a once-a-year problem. The recent pain issues emanated from lifting bags of cement in July, 1998. (Tr. 191). He experienced a vague weakness in the upper body and had pain from the scapula down to the beltline, beltline pain and intermittent right leg numbness. (Tr. 191). Dr. Masten recommended taking Paxil and attending physical therapy. (Tr. 192).

Medical notes dated May 26, 1999 indicate that the MRI of the lumbar spine showed some degenerative changes in the lumbar spine with a "mild bulge at several levels, very mild disc protrusion L5/S1 with no significant central or foraminal stenosis." (Tr. 188). There was some disc space narrowing at L5-S1 but no herniation and degenerative changes at L1-L2 and L2-L3. As a

3

result, Dr. Masten did not recommend surgery but instead opined that an epidural block would be appropriate. (Tr. 188).   An MRI reading from June 3, 1999 showed "normal study" and no evidence for disc herniation was revealed. (Tr. 186).

On June 1, 1999, Dr. Irving Sterman, an orthopaedic surgeon, examined plaintiff. (Tr. 222-26).  Dr. Sterman noted that plaintiff walked across the room with a normal heel-toe gait. (Tr. 225).  He was tender mostly over the posterior elements of T12 and L1. (Tr. 225).  Dr. Sterman concluded that plaintiff had degenerative disc disease of his thoracic spine with some degenerative disc disease of his lumbosacral spine. (Tr. 225).  His impression was that plaintiff suffered from two separate injuries, one to the thoracic spine and one to the lumbar spine. (Tr. 226).

A caudal epidural block was performed on August 11, 1999 which initially brought some improvement. (Tr. 182).  But after examining plaintiff on August 17, 1999, Dr. Masten noted that the epidural block did not help plaintiff's thoracic pain.  One option was to do thoracic facet blocks for the thoracic pain and right sided nerve root blocks. (Tr. 177).   Dr. Masten also recommended physical therapy and prescription medications. (Tr. 177).

On November 16, 1999, Miracle had four selective nerve root blocks done, right L4, L5 and S1, and left L5.  Dr. Masten found that plaintiff had severe lumbar and sciatica pain as well as thoracic. (Tr. 172).  The blocks abolished the pain on the right

4

but only diminished the pain on the left. (Tr. 171).  Dr. Masten reviewed the discography reports during an examination of February 22, 2000. (Tr. 153).  The reports showed most pain appearing at L3-L4 and L4-L5 levels but some abnormalities at other levels. (Tr. 153).  He recommended that plaintiff consider transitioning to a lighter job that would be easier on his back. (Tr. 154).

On December 7, 1999, Dr. Masten performed thoracic facet blocks at T8-9, T9-10 and T10-11.  (Tr. 214).  Plaintiff saw Dr. Masten on June 13, 2000 for a follow-up with ongoing thoracic pain which affected the lower back bilaterally, and lateral thigh and calf pain. (Tr. 150).  The discography of February 8, 2000 did not give a clear indication that surgical intervention would be appropriate. (Tr. 151).  Dr. Masten recommended VESID training for a change in job that would not require as much bending and lifting and that he follow up with Dr. Kowalczyk for pain medications. (Tr. 151).

Plaintiff was given steroid injection at L3-4 on April 8, 2000 and April 22, 2000. (Tr. 242).   On June 8, 2000 Dr. Masten performed transforaminal epidural steroid injections, a four level discography at L2-3, L3-4, L4-5 and L5-S1.  Dr. Masten noted disc bulges at L4-5 and L5-S1 but that because four levels were affected, he would not recommend surgical intervention. (Tr. 212).

On June 22, 2000, Dr. Kowalczyk gave plaintiff a fluoroscopic guided left L3 and L4 transforaminal epidural steroid injection. (Tr. 240).  On July 13, 2000, Dr. Kowalczyk performed left L3 and L4 facet medial branch block. (Tr. 212, 239).

On August 29, 2000, plaintiff was examined by Dr. Masten for ongoing thoracic, back and leg symptoms. (Tr. 149).  Dr. Masten noted that he did not have a good surgical option to offer in the thoracic or lumbar area.  Plaintiff was on total temporary disability.  Conservative treatments of epidural blocks were not successful to alleviate the pain. (Tr. 149).  Plaintiff was to continue to manage with his pain medication. (Tr. 149).

Dr. Kowalczyk noted on October 2, 2000 that plaintiff did not gain significant relief of the pain despite the discography and transforaminal epidural steroid injections and the facet medial branch blocks. (Tr. 235).  Dr. Kowalczyk suggested a psychiatric evaluation and the implantation of a dual lead dorsal column stimulator. (Tr. 235).

On February 8, 2001, Dr. Masten examined plaintiff and discussed the importance of exercise to try to get stronger. (Tr. 147).  On February 18, 2001, Dr. Masten again examined plaintiff for ongoing thoracic and back pain. (Tr. 148) He recommended that plaintiff go forward with the dorsal column stimulator trial while he continue with VESID training for computer network administrator classification.  He considered Miracle to be

6

permanently partially disabled. (Tr. 148).  The dorsal column stimulator was surgically inserted on February 19, 2001. (Tr. 242). The second stage placement of electrodes and programmable pulse generator for the dorsal column stimulator occurred on March 5, 2001. (Tr. 242).

On June 29, 2001, plaintiff was examined by Dr. Masten following his dorsal column stimulator placement. (Tr. 146). Miracle noted that he did not feel any different after the placement but he had not had a chance to go to physical therapy. (Tr. 146).  Miracle was continuing VESID training eight hours a day.  Dr. Masten recommended a follow up appointment and that he continue going to VESID, and opined that Miracle was permanently partially disabled. (Tr. 146).

On August 21, 2001, Dr. Kowalczyk stated that plaintiff was experiencing chronic pain secondary to degenerative disc disease and lumbar facet arthropathy. (Tr. 212, 233).  He outlined two options for Miracle.  The first option would be to insert a second electrode lateral to his other electrode to see if it would benefit the lateral aspect of the thigh.  The second option  was to remove the stimulator.  However, if he had recurring symptoms, he could not reinsert the electrodes but that a laminectomy and placement of a flat lead would be the only recourse. (Tr. 233).

During Dr. Masten's examination on February 26, 2002, plaintiff complained that his thoracic pain and leg pain were as

bad as ever, if not worse. (Tr. 144).  Dr. Masten recommended a permanent partial severe disability level with a trial of dorsal column stimulator because he did not attain sufficient benefit with blocks and was not a good surgical candidate. (Tr. 144).

An independent medical examination by Dr. Elias Nicolas on March 6, 2002 noted that plaintiff was not in acute distress and ambulated with some discomfort. (Tr. 218).  Dr. Nicolas diagnosed chronic back pain and that he had a "temporary, marked, partial disability" but could do sedentary work. (Tr. 218-19).  Dr. Nicolas recommended a re-insertion of a dorsal column stimulator.  On March 18, 2002, Dr. Kowalczyk agreed to proceed with the second set of electrodes after plaintiff had exacerbation of symptoms. (Tr. 232).  The second set of electrodes were inserted on September 16, 2002. (Tr. 242).  Upon follow up examination, Dr. Kowalczyk opined that Miracle could perform sedentary work with a ten pound lifting restriction. (Tr. 212).

Dr. Masten examined plaintiff on February 20, 2003 for ongoing thoracic pain, back and leg symptoms.  Dr. Masten noted that the dorsal column stimulator had "significantly helped his leg symptoms."  Miracle still had beltline pain and thoracolumar junction pain. (Tr. 141). Dr. Masten recommended permanent partial disability and re-evaluation with Dr. Kowalczyk. (Tr. 142).

Plaintiff was examined by Dr. Kowalczyk on March 21, 2003. (Tr. 228-29).  Dr. Kowalczyk prescribed Baclofen for the pain and

8

encouraged plaintiff to return to physical therapy which he had not attended in a "significant period of time." (Tr. 229, 384).

On April 18, 2003, an independent medical evaluation was conducted by Dr. Lester Lieberman. (Tr. 209).  Dr. Lieberman noted that plaintiff had symptoms in his left thigh and calf but that the right thigh was normal. (Tr. 211).  Miracle also had pain in the lower back which he described as "sharp, stabbing, shooting, aching and burning pain." (Tr. 211).  Dr. Lieberman found Miracle to be a "well-proportioned, well muscular" person. (Tr. 214).  Flexion was 30 degrees, extension was 20 degrees, left and right flexion was 25 degrees, right rotation was 30 degrees and left rotation was 30 degrees. (Tr. 215).  The range of motion of both hips was 100 degrees flexion, 30 degrees extension and abduction was 20 degrees. (Tr. 215).  The muscle strength of the back, extensors and lateral flexors was good.  Dr. Lieberman concluded that plaintiff had a "permanent partial disability" and that he could go back to work performing sedentary work where he could get up and down from a chair as needed. (Tr. 216).

Imaging of plaintiff's lumbosacral spine taken on August 13, 2003 showed that there were "slight degenerative changes involving lumbar vertebral bodies." (Tr. 319).  No fracture nor dislocation was noted and the disc spaces showed no appreciable abnormal narrowing. (Tr. 319).

9

Dr. George Alexis Sirotenko examined plaintiff on August 14, 2003 as a consultative medical examination. (Tr. 316-18). Dr. Sirotenko reported that plaintiff had mid and low back pain with intermittent radiation to the anterior aspect of the right hip. (Tr. 316). Dr. Sirotenko noted that pain was worsened by sitting, standing or walking for greater than 30 minutes. (Tr. 316). At that time, plaintiff was taking Hydocodone. He reported to Dr. Sirotenko that he was able to cook three to four times a week, clean and shop once a week and shower, bathe and dress himself. (Tr. 317). Dr. Sirotenko diagnosed plaintiff with "status post chronic back pain" with "no frank features of radiculopathy." (Tr. 318). He recommended that plaintiff avoid repetitive forward flexion, extension or rotation and that he avoid maintaining one position for greater than two hours at a time. (Tr. 318). Dr. Sirotenko opined that plaintiff would be able to push, pull, and lift objects of a moderate degree on an intermittent basis but should avoid lifting any object over his head to prevent axial load. (Tr. 318).

An August 25, 2003 a Physical Residual Functional Capacity Assessment of plaintiff reported that Miracle could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry ten pounds, could stand or walk about six hours in an eight hour workday and had unlimited ability to push and pull. (Tr. 321). Plaintiff was found to be able to stoop, kneel, crouch and crawl frequently.

(Tr. 322).  No manipulative, communicative, environmental or visual limitations were found. (Tr. 322).

Plaintiff returned to Dr. Kowalczyk in May, 2004 after more than a year without medical treatment. (Tr. 380).  Plaintiff presented at his appointment claiming that he had a "band-like pain primarily localized to the low back radiating occasionally to the upper gluteal region as well as anteriorly." (Tr. 380).  Moreover, plaintiff was experiencing some parasthesias into the left lower extremity primarily localized to the anterior thigh and lateral calf. (Tr. 380).  Plaintiff was using his stimulator which helped somewhat.  Examination of the lower extremities revealed good muscle bulk and tone without evidence of atrophy or fasciculation. (Tr. 381).  Dr. Kowalczyk prescribed Medrol. (Tr. 381) At his follow up appointment on July 23, 2004, plaintiff was encouraged to proceed with physical therapy. (Tr. 378).

In January, 2005, a repeat CT scan of the lumbar sacral spine was taken. (Tr. 368).  The scan revealed evidence of asymmetric posterior lateral bulging at L4-L5 to the left as well as bulging to the right at L5-S1. (Tr. 368).

Dr. Kowalczyk continued to treat plaintiff on a monthly basis for the first half of 2005 to monitor his condition and help alleviate his back pain.  Dr. Kowalczyk treated Miracle with fluoroscopic guided translaminar lumbar epidural steroid injections and translaminar lumbar epidurography.  He also reprogrammed

11

plaintiff's dorsal column stimulator. (Tr. 360-72). Yet, plaintiff continued to complain of pain originating in the low back radiating to the lower extremities. (Tr. 362).

On June 1, 2005, Dr. Kowalczyk noted that Miracle had not had any significant improvement in his symptoms of pain and was not utilizing his stimulator as necessary because the stimulator did cause some discomfort in the coccyx region. (Tr. 360). Plaintiff was treated for strength conditioning at Thompson Health Rehabilitation Services from July 14, 2005 through October 15, 2004 for a total of 36 visits. (Tr. 326-51). Upon discharge, plaintiff had achieved gains with lifting ability but there was no significant change in his pain rating. (Tr. 327).

B.   Non-Medical Background

Plaintiff has a high school education with one year of classes taken at a community college. (Tr. 411). Plaintiff worked as a millwright and a laborer throughout his career. (Tr. 67). He began as a millwright in November 1987. His responsibilities in this position included the "installation, removal, leveling and alignment, troubleshooting and modification of industrial equipment." (Tr. 67). Miracle described these duties as requiring constant walking, stooping, handling, grabbing of large objects, standing, reaching and crouching. (Tr. 67). He further claimed that the job entailed one hour of sitting, occasional climbing and

12

crawling. (Tr. 67).  The job required frequent lifting of objects weighing 50 pounds or more. (Tr. 67).

Miracle claimed that he spends his days performing small tasks to get out of the house when he can. (Tr. 115).  When pain was acute, he was unable to put on socks or tie shoes. (Tr. 115).  He claimed that the medication made him drowsy but he was able to prepare food or meals three to four times each week. (Tr. 116).  He shopped for household goods and was able to pay bills and handle savings and checking accounts. (Tr. 118).  Miracle was limited in his ability to participate in his pastimes of boating, fishing and attending sporting events and concerts but he was still able to do these things once or twice a year. (Tr. 119).  He could only sit or stand for short periods of time before he experienced pain. (Tr. 119).

Plaintiff testified that he has beltline pain when he can't do anything at all once every couple of months. (Tr. 419).  The daily leg pain happens every other week for a day. (Tr. 419).  He also testified about the effects of taking his medications.  Miracle stated that when he took Hydrocodon, he could not drive and he sleeps.  Flexeril also had the effect of putting him to sleep. (Tr. 421).  Plaintiff testified that holding his hands up in front of him to perform tasks caused him pain. (Tr. 422).  Plaintiff did testify, however, that he could walk fairly well. (Tr. 422).

Miracle claimed that the pain itself interfered with his train of thought. (Tr. 423).

A typical day for Miracle starts at 7:00 a.m. at which time he tended to his four and seven year old children, taking them to their activities, running errands, occasionally grocery shopping, and paying the bills. (Tr. 424). He read and watched television. (Tr. 424). He tried to do woodworking when he could. (Tr. 425). At the hearing, plaintiff testified that he made a sofa table within the past year. (Tr. 425). He also changed the oil in his truck, jacking the vehicle up to complete the task. (Tr. 426).

The Bowhunter Sighting Log completed by Miracle for the New York State Department of Environmental Conservation revealed that plaintiff went bow hunting nine times spending one and a half to two hours in the stand in October and November of 2005. (Tr. 132-33). Plaintiff testified that after shooting a deer, he helped his uncle drag the deer out and put it on the tractor. (Tr. 431). Plaintiff also has a fishing license which he uses with his daughters along a canal and also along shore to catch bass. (Tr. 431-32).

Plaintiff had career and employment counseling through VESID throughout 2004 and 2005. (Tr. 353-55). Miracle was pursuing employment in the technical support field. His counselor reported on January 24, 2005 that plaintiff had submitted his resume for five available openings that were within his employment criteria but that

14

plaintiff claimed to be in physical discomfort most of the time and was unsure how he would be able to accept a full time position. (Tr. 355).   Although the counselor suggested that plaintiff seek a position he could do through a temporary agency or on a per diem basis to work based on how he is feeling, Miracle did not pursue these options. (Tr. 355).

The VESID report of February 28, 2005 indicated that plaintiff submitted his resume for two openings and attended one interview for a technical assistant position but the position was located too far to commute. (Tr. 354).   The VESID report of March 28, 2005 indicated that plaintiff did not have a "strong motivation to find employment." (Tr. 353).   The counselor tried to discuss alternative job goals but plaintiff was not willing to consider other types of employment. (Tr. 353).

## DISCUSSION

Pursuant to 42 U.S.C. § 405(g), the factual findings of the Commissioner are conclusive when they are supported by substantial evidence.   Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).   A disability is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   An individual's

physical or mental impairment is not disabling under the Act unless it is:

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(2)(A), 1383(a)(3)(B).  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

In evaluating disability claims, the Commissioner is required to use the five step process promulgated in 20 C.F.R. § 404.1520. First, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  Second, if the claimant is not so engaged, the Commissioner must determine whether the claimant has a "severe impairment" which significantly limits his ability to work.  Third, if the claimant does suffer such an impairment, the Commissioner must determine whether it corresponds with one of the conditions presumed to be a disability by the Social Security Commission.  If it does, then no further inquiry is made as to age, education or experience and the claimant is presumed to be disabled.  If the impairment is not the equivalent of a condition on the list, the fourth inquiry is whether the claimant is nevertheless able to perform his past work.  If he is not, the fifth and final inquiry is whether the claimant can perform any other work.  The burden of proving the first four elements is on the claimant, while

the burden of proving the fifth element is on the Commissioner. <u>Bush v. Shalala</u>, 94 F.3d 40, 44-45 (2d Cir. 1996).

Here, the ALJ followed the five step procedure.  In his decision dated June 14, 2004, the ALJ found that plaintiff (1) had not engaged in substantial gainful activity since the onset date of June 9, 2000; (2)suffers from back and leg pain; (3) did not have an impairment that meets or equals one of the listed impairments listed in Appendix 1, subpart P, Regulation No. 4; (4) did not have the residual functional capacity to perform his past relevant work; and (5) had exertional limitations that limit plaintiff to sedentary work. (Tr. 15-24).

In reaching this decision, the ALJ did not find plaintiff's claim of disabling effects from his impairments to be credible. (Tr. 21-24).  The ALJ noted that diagnostic testing showed some evidence of degenerative disc disease and some limitation in range of motion of the back. (Tr. 20).  He found that the residual functional capacities indicated by Dr. Sirotenko and Dr. Lieberman were consistent with this objective medical evidence. (Tr. 20).

The ALJ did not find plaintiff's claims of disabling pain credible in the face of admissions that plaintiff engaged in a number of activities inconsistent with such severe limitations. (Tr. 20).  For example, the ALJ pointed to the facts that plaintiff changed the oil in his truck, a job requiring lifting of the car with a hydraulic hand jack and crawling under the vehicle to remove

17

the oil pan, screw and filter to be inconsistent with the alleged limitations. (Tr. 20).  Plaintiff also admitted that he continued to bow hunt with a bow that weighs five pounds plus the weight of additional accessories. (Tr. 20).  Plaintiff continued to fish, requiring him to twist, turn, push and pull. (Tr. 20).

Plaintiff argues that the ALJ reached an improper residual functional capacity determination because he failed to account for all the limitations articulated by plaintiff's doctors. Specifically, plaintiff points out that the ALJ failed to incorporate Dr. Lieberman's limitation that the plaintiff needed a job where he could get up and down from a chair "as needed," and that he could not bend, twist or turn.  Further, plaintiff argues that the ALJ failed to address Dr. Sirotenko's requirements that plaintiff avoid repetitive forced flexion, extension or rotation as well as avoiding lifting any object overhead.  Plaintiff argues that his need to frequently shift posture between sitting and standing renders him unable to perform the full range of sedentary work.

There is substantial evidence to support the ALJ's conclusion that plaintiff could perform the full range of sedentary work.  In fact, the ALJ did fully incorporate the residual functional capacities suggested by Dr. Lieberman and Dr. Sirotenko.  The ALJ wrote that "Dr. Sirotenko concluded the claimant should avoid repetitive forward flexion, extension or rotation of the spine, and avoid maintaining one position for greater than two hours" and that

plaintiff should "avoid overhead lifting." (Tr. 18).  Further, the ALJ allowed that Dr. Sirotenko required that plaintiff have "breaks for changing position and avoiding repetitive movements." (Tr. 18-19).  The ALJ considered these restrictions when determining that plaintiff was capable of performing sedentary work, a finding consistent with plaintiff's own physicians.

A disabling impairment is one that significantly limits a plaintiff's functional ability, such that he is precluded from performing any type of work activity. 42 U.S.C. § 423 (d)(2)(A); 20 C.F.R. § 404.1520.  The finding that plaintiff could perform the motor functions for sedentary work is supported by plaintiff's own treating physicians.  Dr. Masten found plaintiff to be "partially disabled" but did not preclude plaintiff from performing work-related activities.  Rather, he found plaintiff would be restricted in his ability to lift. (Tr. 151) Similarly, Dr. Nicolas and Dr. Lieberman found that plaintiff was able to perform sedentary work with a ten pound restriction and the ability to move around. (Tr. 216-18).  At no time did plaintiff's treating physicians conclude that plaintiff was totally disabled and unable to return to any work.  Rather, Dr. Masten and others encouraged plaintiff to continue with retraining for lighter work. (Tr. 146).  Similarly, Dr. Kowalczyk opined that Miracle could perform sedentary work with a ten pound lifting restriction. (Tr. 212).

Finally, plaintiff objects to the ALJ finding that Miracle's allegations of pain were not credible.   The ALJ found that plaintiff's activities such as woodworking, working on his truck, hunting and fishing are inconsistent with the severe limitations Miracle claimed that he had.   These activities in conjunction with the statements made in the VESID reports led the ALJ to question plaintiff's motivation to return to the workforce. (Tr. 19-20).   The ALJ's conclusion is supported by substantial evidence.

Plaintiff refers to Dr. Masten's encouragement with VESID training as "hopeful speculation."   This conclusion ignores the frequency and consistency with which the physician advised plaintiff to retrain for lighter work and continue with VESID training. (Tr. 141, 146, 151).   Dr. Kowalczyk's opinion was consistent.   He opined that Miracle could perform sedentary work with a ten pound lifting restriction. (Tr. 212).   The ALJ conclusion is also consistent with the August 25, 2003 Residual Functional Capacity Report reported that Miracle could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry ten pounds, could stand or walk about six hours in an eight hour workday and had unlimited ability to push and pull. (Tr. 321).   The report also found that plaintiff could stoop, kneel, crouch and crawl frequently. (Tr. 322).

Plaintiff also objects to the ALJ's reliance on his hobbies and activities to undermine his credibility that he is totally disabled

by pain.  The record establishes that plaintiff engaged in regular daily activities as well as several hobbies that involved somewhat strenuous work.  Plaintiff himself testified that he participates in the daily household chores of taking care of his children and running errands.  (Tr. 424) In addition, Miracle testified that he continued his hobby of woodworking and actually made a sofa table within the past year. (Tr. 425).  He also changed the oil in his truck, using a hydraulic jack. (Tr. 426).  Plaintiff went bow hunting nine times spending one and a half to two hours in the stand in October and November of 2005. (Tr. 132-33). Plaintiff also has a fishing license which he uses with his daughters along a canal and also along shore to catch bass. (Tr. 431-32).  It was proper for the ALJ to rely on this testimony in assessing the credibility of the plaintiff.

CONCLUSION

This Court finds that there is substantial evidence in the record to support the ALJ's conclusion that plaintiff is not disabled within the meaning of the Social Security Act. Accordingly, the Commissioner's motion for judgment on the pleadings is granted and the Complaint is dismissed.

ALL OF THE ABOVE IS SO ORDERED.


S/Michael A. Telesca
_____
MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
          October 30, 2006